UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW HAMPSHIRE


**Jeffrey M. Rivard**

    **v.**                                    Case No. 06-cv-054-PB
                                                        Opinion No. 2006 DNH 119
**Jo Anne B. Barnhart, Commissioner,**
**Social Security Administration**


**MEMORANDUM AND ORDER**

    Jeffrey Rivard challenges the Commissioner of Social Security's determination that he is not entitled to either disability insurance benefits ("DIB") or supplemental security income ("SSI") benefits.  He argues, among other things, that the Administrative Law Judge ("ALJ" erred by improperly ignoring significant evidence supporting his claim that he cannot return to his past relevant work as a janitor.[1]  For the reasons that

---

[1] Rivard makes several additional arguments, but I need not address them now because this ground alone necessitates a remand. I will, however, briefly mention them in order to direct the ALJ's attention to these issues during further proceedings. First, Rivard argues that the ALJ erred in finding that his previous job as a janitor constituted "past relevant work" within the meaning of the Regulations.  Specifically, he contends that the record lacked sufficient evidence to support such a finding and that the ALJ failed to resolve an inconsistency between the Vocational Expert's ("VE") characterization of the skill level of

follow, I agree and remand this case for further consideration consistent with this order.

## I.   BACKGROUND[2]

### A.   Procedural History

Jeffrey Rivard filed for Disability Insurance benefits and Supplemental Security Income benefits pursuant to Titles II and XVI of the Social Security Act ("SSA") on February 11, 2003 (Tr. 68-70, 259-261), with a protective filing date of January 24, 2003 (Tr. 67).  His date last insured was June 30, 2004.  (Tr. 71). He claimed that he had been unable to work since October 31, 2002 due to problems stemming from bipolar disorder and schizophrenia.  (Tr. 68, 78).  His application was denied both

---

Rivard's janitor job and the skill levels of the janitor positions listed in the Dictionary of Occupational Titles ("DOT").  Alternatively, Rivard argues that the ALJ should have disregarded the janitor job as an "unsuccessful work attempt" that would not constitute past relevant work within the meaning of the Regulations. Rivard also contends that the ALJ's step four analysis was insufficient because he did not make the required specific findings of fact regarding Rivard's RFC, the physical and mental demands of his past work, and the fit between the two.

[2]  Unless otherwise noted, the background facts are taken from the Joint Statement of Material Facts (Doc. 10) submitted by the parties pursuant to Local Rule 9.

initially and on reconsideration. (Tr. 35-41, 46-49).

Rivard then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 53). The hearing convened on March 3, 2005 (Tr. 271). The ALJ issued his decision on April 13, 2005, ruling that Plaintiff was not disabled within the meaning of the Act. (Tr. 21-32). Rivard subsequently requested that the Appeals Council review the ALJ's decision. (Tr. 18-20). The Appeals Council declined to do so (Tr. 6-9), thus making the ALJ's decision the final agency determination. The case therefore became ripe for judicial review.

**B.   Rivard's Educational, Vocational, and Medical History**

Rivard began having behavioral problems during his junior high school years. (Tr. 222). He was involved with a gang and was frequently violent and aggressive. (Tr. 222-226).

Rivard was psychiatrically hospitalized for the first time in November 1997, at age 17, because of concerns regarding his violent behavior. (Tr. 136-153, 239-243). After being discharged in March 1998, there were lingering concerns about his potential for violent behavior, but it was noted that he was calm, sociable, and in control of his behavior while in the hospital. (Tr. 241, 243). It was also noted that his observed

behavior clashed with his self-reports of violent behavior, leading to the conclusion that Plaintiff may have been confabulating to some extent. (Tr. 236, 241, 243).

Rivard was hospitalized again from May 27, 1998 to June 17, 1998 and from March 4, 1999 to March 15, 1999. (Tr. 227). He was very manageable and in control of his behavior during both hospitalizations. (Tr. 230, 236). Medical notes from January 2003 reflect that he complained of being irritated, depressed, and anxious. (Tr. 189, 194). He stated that his then girlfriend had broken up with him because he had been verbally abusive and had punched and dented the refrigerator and a table. (Tr. 189). Each had a restraining order out against the other. Id. Rivard was not taking any medications. (Tr. 192). Rivard's affect was flat, but he was cooperative, and his thought processes were clear and coherent. (Tr. 194). His judgment was impaired, and his insight was minimal. (Tr. 194). His memory was intact. Id.

In February 2003, Rivard reported that he lived in a shelter for homeless men. (Tr. 95, 104). He prepared all his own meals and went grocery shopping once per week. (Tr. 95-96). He watched TV and read about one book per month. (Tr. 96-97). He stated he could handle his own money. (Tr. 96). He reported

that he was capable of working, but that he felt that Social Security benefits would help him to support himself.  (Tr. 99).

Rivard underwent a psychiatric evaluation on April 15, 2003. (Tr. 186-188).  He still had some mood instability, but it was noted that medications had helped.  Id.  He was personable, and his affect was good with no lability.  Id.  He exhibited no obvious evidence of psychosis, and his insight and judgement were good.  Id.  Rivard was subsequently hospitalized for a one night in May 2003.  (Tr. 162-163).  He complained of being overwhelmed and depressed and claimed to be suicidal.  Id.  He was using drugs and alcohol at the time, and it was noted that he had been diagnosed with bipolar disorder.[3]  Id.  While in the hospital, Rivard maintained good behavioral control, was engaged and cooperative, ate and slept well, and participated in most patient activities.  (Tr. 163, 167).  He was discharged with a Global Assessment of Functioning (GAF) Score of 60.  (Tr. 163).[4]  In

---

[3]  Bipolar Disorder - a mood disorder characterized by the occurrence of one or more manic episodes; in almost all cases in one or more major depressive episodes will eventually occur. Dorland's Illustrated Medical Dictionary, 492 (28th ed. 1994).

[4]  See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (GAF score of 51-60 reflects moderate symptoms).

June 2003, Rivard began living in a residential treatment program, which provided needed structure in his life. (Tr. 110-111). He was then working up to 25 hours per week at Burger King. Id. He reported that he had problems concentrating, that he had trouble with insubordination and working with people, and that his mood swings caused him to behave in ways deemed unacceptable to the public. (Tr. 121-125). A third party reported in June 2003, that Rivard spent his days working at Burger King, hanging out with his friends, and watching TV. (Tr. 112). He had no problems with his personal care and needed no help taking his medications. (Tr. 113). He prepared his own meals, did laundry and chores, and was able to pay bills, count change, use money orders, shop, and travel. (Tr. 115). He visited with family and friends. (Tr. 116). His behavior was noted to be that "of a 20 year old," meaning that he sometimes aggravated his house mates. (Tr. 116). He could pay attention for one hour or longer. (Tr. 117). He finished what he started and was able to follow written and spoken instructions. (Tr. 118). He did have problems handling stress, but had not been observed behaving in any unusual manner. (Tr. 118). Dr. Jeremy Spiegel noted in June 2003, that Rivard had been doing pretty

well. (Tr. 185). He was pleasant and calm. Id. His thoughts were linear without psychosis. Id. He had no suicidal or homicidal ideation. Id.

Rivard was subsequently hospitalized in February 2004, for four days after having stopped his medications. (Tr. 254). He thereafter saw Dr. Ruth Frydman in July 2004. (Tr. 254- 256). He told Dr. Frydman that he had been sober for four to six months, that his mood was fine, and that his concentration had been good. Id. He denied hallucinations, but did report to feeling sometimes as though he was being poked or brushed. Id. He lived with his parents after leaving the hospital and later moved to a residence on Nye Street. Id. He reported that he had run into legal problems because of stealing and that he had to serve jail time. (Tr. 254). He also reported that he had violated the restraining order that his ex-girlfriend had taken out against him by visiting their child. (Tr. 255). This had also resulted in a stint in jail. Id. He had been on probation for one year. (Tr. 255). Dr. Frydman noted that Rivard's behavior was appropriate except for his reluctance to take certain medications. (Tr. 254-256). Dr. Frydman noted that Rivard continued to have problems with mood swings and concurrent

psychotic symptoms despite sobriety. Id. She noted, however, that his thoughts were clear and logical and that he had moderate insight and judgment. Id. In August 2004, Rivard told Dr. Frydman that he had been kicked out of the Nye Street residence and that he had moved back in with his parents. (Tr. 252). His mood had been fairly stable. Id. He reported that he had stolen some items recently, but that he wanted to stop that behavior, as he was attempting to obtain a degree. Id. He was cooperative and appropriate, and his thoughts were clear and logical. Id. He visited Dr. Brendan Kirby in September 2004. (Tr. 250-251). Dr. Kirby noted that Rivard was unemployed, but not disabled. (Tr. 250). He told Dr. Kirby that he had become remorseful about his past aggressive behavior and stated that he was no longer abusing substances. (Tr. 250-251). Rivard behaved appropriately and cooperatively. Id. There was no evidence of hypomania, mania, or depression. Id. His concentration and attention span were normal, his judgment was intact, and his insight into his illness was fair. Id. There was no evidence of psychosis and Rivard was felt to be safe to himself and others. (Tr. 250-251). Rivard saw Dr. Kirby again in October 2004. (Tr. 248). He reported that he was "all right." (Tr. 248). He behaved

appropriately and cooperatively and concentrated and attended well. Id. His substance abuse problem was in early partial remission. Id.

C.  **Functional Capacity Evaluations**

On September 4, 2003, a Disability Determination Services (DDS) physician reviewed Rivard's records and concluded that he suffered from bipolar disorder and anti-social personality disorder. (Tr. 201, 205). He indicated that, because of these disorders, Rivard experienced a moderate degree of limitation in terms of maintaining social functioning and maintaining concentration, persistence, and pace. (Tr. 198-211). Based on these conclusions, he determined that an RFC Assessment was necessary. (Tr. 198). The physician conducted an RFC Assessment on the same day and concluded that when Rivard was not abusing drugs or alcohol he was capable of performing simple 1-3 step tasks, that he could concentrate well enough to complete such simple tasks, that he had social skills, but worked best alone, and that he could adapt to simple changes. (Tr. 214-215). The physician also indicated that Rivard suffered from moderate limitations with respect to the following abilities: the ability to understand and remember detailed instructions, the ability to

carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances, the ability to work in coordination with or proximity to others without being distracted by them, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, the ability to respond appropriately to changes in the work setting, and the ability to set realistic goals or make plans independently of others. (Tr. 212-213).  This assessment was affirmed by a second DDS physician on September 26, 2003. (Tr. 216).

### D.  **Rivard's Hearing Testimony**

Rivard, who was 22 years old at the time of the ALJ's decision (Tr. 29, 68), testified that in approximately the middle of eighth grade he transferred to an alternative school program for students with behavioral problems.  (Tr. 275).  He finished the 10th grade in the alternative program and subsequently obtained his GED.  (Tr. 280-281).  He began having problems with

the legal system as a juvenile. (Tr. 280). He admitted to having had problems with anger and rage and getting along with people since the seventh or eighth grade. (Tr. 284). He also admitted to a history of abusing drugs, but stated that he had been clean since January 2004. (Tr. 291). He denied having any problems with alcohol. (Tr. 292). He stated he had been hospitalized for psychiatric problems several times, the last time being in February 2004. (Tr. 306-307). He had a diagnosis of bipolar disorder. (Tr. 292). Medications helped control his symptoms. (Tr. 295-296, 301). He testified that he could probably obtain a job, but that he did not think he could keep one because of his problems with mood swings, paranoia, and sleep. (Tr. 305). He maintained that he sometimes got "cocky" with authority figures, but that his primary problem was working with co-workers. (Tr. 289). He had previously worked in positions in the food industry, a blanket factory, a laundry facility, and as a janitor. (Tr. 283- 289, 309). The position he held the longest was for nine months at Burger King. (Tr. 307). He got fired from all but one position—the one at the laundry—which he quit because he didn't care for it. (Tr. 283-288, 312). He was fired for various reasons ranging from

showing up late, mocking his manager, and allegedly being in possession of drugs. (Tr. 283-288, 312). He testified that he regularly missed at least one day of work per month and was late often. (Tr. 313-314). After being warned, however, he did not miss work or show up late at the blanket factory because the job paid $14 per hour and he did not want to lose it. (Tr. 314). At the time of the hearing, Rivard lived with a girlfriend. (Tr. 302). He performed chores around the house and occasionally helped out at his mother's barber shop. (Tr. 302, 304). He had a two and one-half year old child that he did not see. (Tr. 303).

**E.     Vocational Expert Testimony**

The VE testified that Rivard's past relevant work consisted of fast food and janitorial work, which was light and unskilled as performed. (Tr. 79, 87-91, 309). Upon questioning by the ALJ, the VE stated that janitorial work would be a good placement for an individual who had trouble dealing with coworkers and/or supervisors. (Tr. 310). The VE further testified that if Rivard's rate of absenteeism is a day a month or greater, any potential occupational base would likely be abolished. (Tr. 311-312). In response to a hypothetical question posed by Rivard's

attorney, the VE testified that the cumulative effect of several less than satisfactory abilities indicated in Rivard's medical records would abolish any occupational base. (Tr. 316).

## F.   The ALJ's Decision

The ALJ followed the five-step sequential evaluation process, pursuant to 20 C.F.R. §§ 404.1520 and 416.920, to determine whether Rivard was disabled.[5] (Tr. 21-32). At the first step, the ALJ found that Rivard had not engaged in substantial gainful activity since his alleged onset date. (Tr. 27, 28 at Finding 2). At steps two and three, he found that Rivard's bipolar disorder and history of drug and alcohol abuse were severe impairments, but that they did not meet or equal a listed impairment under Appendix 1, Subpart P of Regulations No.

---

[5] The claimant has the burden at the first four steps to show that: (1) the claimant is not engaged in substantial gainful activity; and (2) the claimant has a severe impairment; and (3) the impairment meets or equals a specific impairment listed in the SSA regulations; or (4) the impairment prevents or prevented the claimant from performing past relevant work. Id. at § 404.1520(a)(4)(i)-(iv).

At step five, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant can perform." Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991). The ALJ's conclusions at steps four and five are informed by his assessment of the claimant's residual functional capacity ("RFC"), which is a description of the kind of work that the claimant is able to perform despite her impairments. 20 C.F.R. §§ 404.1520, 404.1545.

4. (Tr. 27, 28 at Findings 3 and 4). The ALJ further determined that Rivard retained the Residual Functional Capacity (RFC) to perform simple, unskilled, repetitive work at all levels of exertion that did not involve extensive public contact. (Tr. 28 at Finding 6). At step four, the ALJ found, based on the VE testimony, that Rivard could perform his past relevant work as a janitor (Tr. 28 at Findings 7-8), and that he was not under a disability at any time relevant to his decision. (Tr. 28 at Finding 9).

## II.  **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the ALJ's decision. The ALJ's factual findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g); Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence is that which "'a reasonable mind, reviewing the evidence in the record as a whole, could accept . . . as adequate to support [the] conclusion.'" Id. (quoting Rodriguez v. Sec'y of Health and

Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  Thus, the ALJ's decision is supported by substantial evidence if it is reasonable.  See id.

The ALJ is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence.  Id.  If the ALJ's findings as to these matters are reasonable, I must uphold them "even if the record arguably could justify a different conclusion."  Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988).  On the other hand, the ALJ's findings are not conclusive if they were "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  I apply these standards to the arguments Rivard raises in his appeal.

### III. ANALYSIS

In this case, the ALJ determined that Rivard was not entitled to benefits because his impairments did not prevent him from returning to his past work as a janitor.  He first found that Rivard's RFC allowed him to perform simple, unskilled, repetitive work that did not involve extensive public contact.

Then, based on the testimony of the VE that a janitorial job "seems to be a pretty good place to put folks who have trouble dealing with coworkers"[6] (Tr. 310), the ALJ reasoned that Rivard's past relevant work as a janitor did not require the performance of work-related activities precluded by his RFC. Therefore, the ALJ determined, Rivard's impairments did not prevent him from performing his past relevant work, so he was not disabled.

Rivard argues that the ALJ erred by ignoring important portions of the record. First, Rivard claims that the ALJ ignored his testimony that he "missed more than one day a month regularly" in previous employment situations. (Tr. 314). Earlier in the proceeding, the VE testified that "if [Rivard's] rate of absenteeism is a day a month or greater, [which would constitute an] essentially excessive rate of absenteesim, then I think that would abolish any potential occupational base in the

---

[6] The testimony of the VE came in response to the following hypothetical question posed by the ALJ: "Mr. Newman, the claimant has a GED education at age 22. He has described to us significant problems dealing with people in general, particularly coworkers, seems to have lead to his downfall on several of these job attempts. If you were trying to place such a person in some sort of an occupation, would you put him in any of the jobs he's had in the past?"

scheme of occupations." (Tr. 312). In light of this expert testimony, the evidence in the record that Rivard routinely missed more than one day of work per month throughout his employment history clearly constitutes probative evidence in support of Rivard's claim. Thus, it should have been considered by the ALJ. See Nguyen, 172 F.3d at 35.

Additionally, Rivard contends that the ALJ ignored important portions of the Psychiatric Review Technique ("PRT") form (Tr. 198-211) and the Residual Functional Capacity Assessment ("RFCA") form (TR. 212-215). These forms indicate that Rivard exhibited moderate limitations with respect to several areas of functionality.[7] This evidence is particularly probative in light of the VE's response to following hypothetical question posed by Rivard's attorney:

> I'd like you to assume the following, and I'm going to base it on Exhibits F6 and F7[8], that[] this claimant

---

[7] These limitations are listed specifically in the excerpt of hearing testimony that follows.

[8] Exhibits F6 and F7, respectively, are the PRT and RFCA forms referenced above. Both forms were completed by DDS physicians. Thus, the inputs used by Rivard's attorney in the hypothetical are supported by medical evidence in the record. See Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). (reasoning that for a VE's "answer to a hypothetical question to be relevant, the inputs into that hypothetical must

> would have the following limitations. Potentially
> mental health limitations by the DDS physician from
> this case said he would have moderate difficulties in
> maintaining social functioning; moderate difficulties
> in maintaining concentration, persistence or pace; he
> would have moderate difficulties in his ability to
> understand and remember detailed instructions, and to
> carry out those detailed instructions; moderate
> problems in his ability to maintain attention and
> concentration for extended periods, to perform
> activities within a schedule, to maintain regular
> attendance, to be punctual within customary tolerances;
> and moderate difficulties in his ability to work in
> coordination with or in proximity to others without
> being distracted by them; and finally, moderate
> difficulty in maintaining-in completing a normal
> workday and workweek without interruptions from his
> psychologically based symptoms, and his ability to
> accept instructions and to respond appropriately to
> criticism in the work setting. If the claimant had
> these limitations, do you think he could do any of this
> part relevant work?

When the VE expressed confusion as to the proper definition of "moderate,"[9] Rivard's attorney described the term essentially as a "less than satisfactory" level of functionality with respect to a given ability for "one-third of the day." (Tr. 316). After accepting this definition for the purposes of the question, the VE testified:

---

correspond to conclusions that are supported by the outputs from the medical authorities").

   [9] The term "moderate" is not defined in the medical forms at issue or in the Regulations.

> I think that this is one of those cases where the
> cumulative effect would really come into play.  The
> cumulative effect on all of these less than
> satisfactory abilities on an occasional basis, I think
> probably would abolish any occupational base, if that's
> your definition of moderate.  (Tr. 316).

Given the VE's testimony that a given combination of moderate limitations could "abolish any occupational base," the portion of Rivard's medical records indicating that he exhibited that very combination of limitations constitutes probative evidence that the ALJ should have considered.  See Nguyen, 172 F.3d at 35.

Because the ALJ's decision completely failed to mention either Rivard's testimony with respect to his chronic absenteeism or the medical records indicating that Rivard suffered from moderate functional limitations, it is impossible to determine whether this evidence was considered and implicitly discredited or instead was simply ignored.  See Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).  At the very least, these portions of the testimony and the medical records constitute evidence that an ALJ should consider and evaluate in the course of reaching a decision.  See 20 C.F.R. §§ 404.1520(a) ("We consider all evidence in your case record when we make a determination or decision whether you are disabled."), 404.1512(b) (defining "evidence" to include anything that a claimant or "anyone else

submits to [the SSA] that relates to" a claim). Although the ALJ could have discredited Rivard's testimony or rejected the definition of "moderate" posed by Rivard's counsel, he was nonetheless obligated to explain his reasons for doing so. See Cotter, 642 F.2d at 707. Accordingly, the ALJ's decision was not based on substantial evidence.

## IV.  CONCLUSION

For these reasons I grant Rivard's motion for an order reversing the decision of the Commissioner (doc. no. 8) and deny the Commissioner's motion for an order affirming the decision of the Commissioner (doc. no. 9). The ALJ's decision is vacated and remanded for further development of the record in line with this opinion.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

October 17, 2006

cc:  Francis Jackson, Esq.
     Karen Nesbitt, Esq.
     David Broderick, Esq.